T.C. Memo. 2001-119

UNITED STATES TAX COURT

METRO LEASING AND DEVELOPMENT CORPORATION, EAST BAY
CHEVROLET COMPANY, A CORPORATION, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 8054-99, 8055-99.         Filed May 18, 2001.

<u>William L. Raby</u>, for petitioners.

<u>Kathryn K. Vetter</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  In these consolidated cases, respondent determined the following deficiencies and penalties in petitioners'[1] 1995 and 1996 taxable years:

---

[1] Petitioner, Metro Leasing and Development Corp. is a successor in interest to petitioner, East Bay Chevrolet Co., a corporation.  Accordingly, there is no need to distinguish between them for purposes of this opinion, and petitioners will be collectively referred to as petitioner.

| Year | Deficiencies | | Penalty |
| | Income tax | Accumulated earnings tax | sec. 6662(a) |
| --- | --- | --- | --- |
| 1995 | $307,699 | $108,714 | $61,540 |
| 1996 | 142,559 | --- | 28,512 |

The parties have reached agreement with respect to several issues, and the following issues remain for our consideration: (1) Whether for its 1995 or 1996 tax year petitioner is entitled to deduct officer's compensation in any amount exceeding $76,800, the amount determined by respondent; (2) whether for its 1995 tax year petitioner permitted its earnings to accumulate beyond the reasonable needs of the business so as to be subject to the accumulated earnings tax; and (3) whether petitioner is liable for an accuracy-related penalty under section 6662(a)[2] for 1995 and/or 1996.

## FINDINGS OF FACT

Metro Leasing and Development Corp., petitioner, had its principal place of business in El Macero, California, at the time the petitions were filed in these cases. During the years in issue, George Valente, who was approximately 70 years old, was director and owned 100 percent of the common stock of petitioner. Mr. Valente became ill in 1992 and suffered from prostate cancer during 1995 and 1996. Mr. Valente was somewhat disabled by and

---

[2] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

concerned about his condition, so he appointed his wife, Lena Valente, to be petitioner's president during the years under consideration. During 1995 and 1996, Mrs. Valente was 66 and 67 years of age, respectively. Even though he was ill, Mr. Valente remained active in petitioner's business by means of a cooperative effort with Mrs. Valente. Under that arrangement, Mr. Valente was the decision-maker, and Mrs. Valente executed his decisions. Mr. Valente determined the amount of compensation to be paid to officers based on the profitability of the business. Because of their joint efforts, Mr. and Mrs. Valente's compensation was treated as an undivided amount for their combined efforts. Mrs. Valente became ill during 1996, retiring at the end of that year, and she died during 1998.

Mr. Valente became involved in the automobile business in 1959 and at one point owned seven automobile dealerships and an automobile leasing company. Mr. Valente sold the last of his automobile dealerships, Green Valley Ford, in 1990. In connection with the last sale, Mr. Valente agreed to provide business consultation to the new owners and to "run" the profit-sharing plan. The new owners agreed to provide the Valentes with a new car each year. In 1991, Mr. Valente received $20,444 of compensation from Green Valley Ford and for 1992, 1993, 1995, and 1996 he received $1,690, $2,851, $3,289, and $2,049, respectively. For 1995 and 1996, Mr. Valente received distributions of $55,307 and $76,076, respectively, from Green Valley Ford's profit-sharing plan.

During the years in issue, petitioner had three employees, Mr. and Mrs. Valente and Jo Ann Michaels, who was the corporate secretary and bookkeeper. As bookkeeper, Ms. Michaels deposited receipts, prepared checks, reconciled bank statements and maintained the books of account, including the general ledger and the cash receipts and disbursement journals. Petitioner's place of business was in the Valentes' residence.

Petitioner's business during 1995 and 1996 included the ownership of land and buildings leased to Green Valley Ford, under which the lessee paid the expenses associated with the property. Petitioner was also engaged in the business of leasing automobiles and the purchase and sale of real property. Petitioner had approximately 10 automobile leases during the years in question, all of which had been entered into prior to 1995. Petitioner's assets included land and a building in El Cerrito, and mortgages receivable in excess of $2.5 million, secured by real property located on Airport Boulevard, South San Francisco. Petitioner had sold this property, on the installment basis, on January 19, 1995.

Mr. Valente was qualified to be involved in any aspect of the automobile business, including petitioner's activities of leasing realty to an automobile dealer and leasing automobiles. Mr. Valente was, in general, successful and experienced in business operations. For the 12-year period 1985 through 1996, his highest annual wages exeeded $1 million, and his average wages for that period exceeded one-half million dollars. After

1990 and before 1995, however, Mr. Valente's reported wages did not exceed $320,000 and were as low as $151,690 and averaged $209,462. Mr. Valente consulted for and was compensated by Green Valley Ford. He also consulted with the dealership executives in connection with petitioner's business operations. Mr. Valente spent as much as 15 hours per week consulting. His expertise was also used in connection with the South San Francisco property, which also involved an automobile dealership. He consulted with that dealership's executives to help ensure their continued ability to make mortgage payments on petitioner's self-financed sale of the property to the new dealer. Mr. Valente also spent a limited amount of time working on petitioner's accounts collectible.

For 1995, petitioner deducted $240,435 as compensation to officers, which included a yearend bonus of $180,435. For 1996, petitioner deducted $460,000 as compensation to officers, including yearend bonuses of $150,000 to Mrs. Valente and $250,000 to Mr. Valente. For years prior to 1995, the Valentes reported wages as follows:

| Year | Amount |
|------|--------|
| 1985 | $498,647 |
| 1986 | 493,485 |
| 1987 | 1,053,801 |
| 1988 | 1,075,075 |
| 1989 | 941,407 |
| 1990 | 1,072,362 |
| 1991 | 320,000 |
| 1992 | 151,690 |
| 1993 | 152,851 |
| 1994 | 213,305 |

For 1995 and 1996, petitioner's gross receipts consisted of the following amounts:

| Type of income | 1995 | 1996 |
|---|---|---|
| Interest income | $259,652 | $240,427 |
| Gross rents | 353,376 | 388,676 |
| Net capital gains | 35,884 | 267,657 |
| Form 4797 gain | 246,346 | 8,141 |
| Late fees | 2,931 | 1,170 |
| Total income | 898,189 | 906,071 |

Petitioner's total income before expenses, officer's compensation, and ratio of compensation to total income for 1987 through 1996 were as follows:

| Year | Total income | Officer compensation | Compensation as percentage of total income |
|---|---|---|---|
| 1987 | $626,991 | $425,000 | 67.8 |
| 1988 | 583,949 | 310,000 | 53.1 |
| 1989 | 503,859 | 260,000 | 51.6 |
| 1990 | 569,530 | 260,000 | 45.7 |
| 1991 | 946,396 | 360,000 | 38.0 |
| 1992 | 604,344 | 150,000 | 24.8 |
| 1993 | 633,688 | 150,000 | 23.7 |
| 1994 | 640,602 | 210,000 | 32.8 |
| 1995 | 898,479 | 240,435 | 26.7 |
| 1996 | 806,071 | 460,000 | 57.1 |

Petitioner acquired and sold shares of stock as follows:

| Company name | Date acquired | Date sold |
|---|---|---|
| Data Med | 9/20/88 | 5/9/95 |
| Mylex Corp. | pre-'95 | --- |
| Cyrix Corp. | '95 & '96 | '96 |
| Focus Enhancement | 5/23/96 | 12/9/96 |
| IMP, Inc. | 12/16/94 | 5/9/96 |
| Interactive Medical Tech. | 6/30/95 | 10/21/96 |
| Oryx | '96 | --- |

Respondent determined the amount of petitioner's allowable deductions for reasonable compensation by use of statistics reflecting compensation for corporate officers in the equipment-leasing and real estate-rental business.  Based on those statistics, respondent determined that petitioner was entitled to a deduction of $76,800 for each of the years 1995 and 1996 as reasonable compensation for the Valentes' services to petitioner.

The following schedule reflects respondent's comparison between petitioner's taxable income; adjusted taxable income (adjusted to not include net operating loss deductions, special deductions, and deductions for officer's compensation); officer's compensation; and the percentage of adjusted taxable income represented by officer compensation:

| Year | Taxable income | Adjusted taxable income | Compensation | Percentage |
|------|----------|----------|--------------|------------|
| 1987 | ($171,253) | $285,636 | $425,000 | [1]100.0 |
| 1988 | 33,406 | 343,406 | 310,000 | 90.3 |
| 1989 | (19,237) | 240,763 | 260,000 | [1]100.0 |
| 1990 | (5,402) | 273,871 | 260,000 | 94.9 |
| 1991 | 327,543 | 692,945 | 360,000 | 52.0 |
| 1992 | 244,323 | 394,376 | 150,000 | 38.0 |
| 1993 | 26,348 | 176,348 | 150,000 | 85.1 |
| 1994 | (36,327) | 173,673 | 210,000 | [1]100.0 |
| 1995 | 17,825 | 294,587 | 240,435 | 81.6 |
| 1996 | 58,755 | 518,755 | 460,000 | 88.7 |

[1] Greater than 100 percent.

The following schedule reflects the dividends received by the Valentes from petitioner:

| Year | Amount |
|------|--------|
| 1985 | -0- |
| 1986 | -0- |
| 1987 | -0- |
| 1988 | $17,600 |
| 1989 | 10,560 |
| 1990 | 11,241 |
| 1991 | 60,000 |
| 1992 | 10,000 |
| 1993 | 10,800 |
| 1994 | -0- |
| 1995 | -0- |
| 1996 | -0- |

Petitioner owned property in El Cerrito, which had been used as a parking lot, and Mr. Valente envisioned future development of the property. Although Mr. Valente envisioned future development at a cost ranging from $7 million to $10 million, as of the years in question, no plans had been made for development nor action commenced to initiate a formal plan to develop the property. Petitioner, through its bookkeeper and the Valentes,

provided all relevant information to their accountant and relied upon his expertise and judgment in the preparation and reporting of Federal income.

OPINION

I. Reasonable Compensation

The parties disagree about the methodology to be used for measuring or determining the amount of reasonable compensation. They also rely on differing facts in applying the standards. Section 162 provides for deductions for ordinary and necessary expenses incurred in carrying on a trade or business, including a reasonable allowance for salaries or compensation for services performed.

Respondent, emphasizing case law from opinions of the Court of Appeals for the Ninth Circuit,[3] argues that when payments are made to a corporate employee who is also a principal shareholder, the compensation must be reasonable in amount and have a purely compensatory purpose. See O.S.C. & Associates, Inc. v. Commissioner, 187 F.3d 1116, 1119-1120 (9th Cir. 1999) (and cases cited therein), affg. T.C. Memo. 1997-300.

Respondent also points out that the Court of Appeals for the Ninth Circuit traditionally has looked to five factors, none of which is decisive, to evaluate whether compensation is reasonable, to wit: (1) The employee's role in the company; (2)

---

[3] Barring a stipulation to the contrary, any appeal from this Court's decision would be to the Court of Appeals for the Ninth Circuit. See sec. 7482(b).

an external comparison of the employee's salary with salaries paid by similar companies for similar services; (3) the character and condition of the company; (4) the conflict of interest between the company and the employee; and (5) the internal consistency in the company's treatment of payments to employees. See, e.g., Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245-1248 (9th Cir. 1983), revg. T.C. Memo. 1980-282.

Petitioner, in a similar fashion, points out that there are five traditional factors that the courts have used to decide whether compensation is reasonable, to wit: (1) The type of services and their extent; (2) the scarcity of qualified employees; (3) qualifications and prior earning capacity; (4) the net earnings of the corporate taxpayer; and (5) the peculiar characteristics of the taxpayer's business. Petitioner's suggested traditional factors are, in essence, the same ones the Court of Appeals for the Ninth Circuit has utilized.

Each party reviews the facts of these cases under the traditional factors and concludes that their position is fully supported--i.e., respondent contends that his determination is correct, and petitioner contends that its compensation claims are reasonable. Petitioner, however, contends that the traditional tests are not adequate in the circumstances of these cases. Petitioner urges us to use exclusively the "independent investor test" in the same manner as used by the Court of Appeals for the Seventh Circuit in Exacto Spring Corp. v. Commissioner, 196 F.3d

833, 835 (7th Cir. 1999), revg. <u>Heitz v. Commissioner</u>, T.C. Memo. 1998-220.

We begin our reasonable compensation analysis by evaluating the facts of these cases in the context of the traditional factors, in the format used by the Court of Appeals for the Ninth Circuit.

A.   <u>The Employee's Role in the Company</u>

We consider the Valentes as a single unit in the setting of this case because Mr. Valente was ill, and, although he was able to make decisions, it was Mrs. Valente who executed his decisions.  Although a large portion of the compensation was paid to Mrs. Valente, the total compensation was based on the Valentes' joint efforts or performance, and we refer to that performance collectively and in the singular.  The Valentes (initially Mr. Valente and then Mrs. Valente) were taken ill and became unable to fully function in petitioner's business. Petitioner's sources of income are of a passive or investment nature, in that income was generally received from established capital investment rather than from personal services.  Prior to the years under consideration, Mr. Valente sold his active operating interests in automobile dealerships and a leasing operation.  Thereafter, operating out of the Valentes' home, petitioner's sources of income were mainly from investment type activity--collection of rent and interest and the purchase and sale of securities and realty.  Except for the ownership of a

couple of parcels of land and some stock, petitioner's source of income was from the remnants of Mr. Valente's former ownership of automobile dealerships. Until the beginning of 1995, they owned realty that was leased to two different Ford dealerships. In the beginning of 1995, they sold one of the properties to the lessee and their income therefrom became income from seller-financing rather than from rental.

Due to their age and physical condition, the Valentes were essentially semiretired. During 1995 and 1996, Mr. Valente was recuperating from surgery necessitated by prostrate cancer, so that his ability to participate in petitioner's business activity was more limited than it had been in prior years. For the 4 years immediately prior to 1995 and 1996, the Valentes' wages or salary, including amounts received other than from petitioner, averaged just over $200,000. For 1995 and 1996, the years under consideration, petitioner compensated the Valentes in the amounts of $240,435 and $460,000, respectively. We note that for 1995 and 1996, the Valentes were more hindered by health and age than in prior years and unable to devote their full efforts to the business.

Mr. Valente's consultation to automobile dealerships which either leased from petitioner or for whom petitioner was mortgagor is thought by petitioner to be critical to the success of the automobile companies. We are not able to find that Mr. Valente's role was critical, especially because the financial

condition of the dealerships was not made a part of the record. There is no indication that the dealerships that leased or purchased from petitioner were in financial difficulty or that petitioner's income stream was in jeopardy. Mr. Valente did, in any event, play a role in obtaining and maintaining the source of rental and interest income. We must note, however, that Mr. Valente received each year the use of a new automobile, monetary compensation, and relatively large profit-sharing distributions from the Green Valley Ford dealership.

For the years 1995 and 1996, approximately 68 percent and 78 percent, respectively, of petitioner's income was from interest and rents derived from sources that were established prior to or at the beginning of the 1995 year. The majority of the remainder of petitioner's income was derived from the sale of property, both real and personal. Other than the Valentes, petitioner had only one employee, who was a clerical/bookkeeper. Accordingly, petitioner's financial success and the job of ensuring a continued income stream fell upon the Valentes. Although it was not shown that the automobile dealerships to whom land had been sold on installment contract or leased were in financial difficulty, petitioner has shown that, to some extent, Mr. Valente's efforts helped to ensure or maintain the income stream. Those same efforts also enhanced the capital structure of petitioner. In these circumstances, it is difficult to decide

whether the Valentes' efforts were designed to generate income and/or to protect Mr. Valente's capital investment.

B.  An External Comparison of the Employee's Salary With Salaries Paid by Similar Companies for Similar Services

On this point, respondent contends that Mrs. Valente would not be entitled to earn the amount petitioner paid her during 1995 and 1996.  Conversely, petitioner argues that the compensation paid to Mr. and/or Mrs. Valente was for their joint effort.  Admittedly, Mrs. Valente acted in the nature of an amanuensis for Mr. Valente; however, petitioner has shown that its payments were to the Valentes for their joint efforts.  Our focus here is not on the question of who should report the income but on the amount deductible as reasonable compensation for the efforts of the operative officers of petitioner.  See, e.g., Lewisville Inv. Co. v. Commissioner, 56 T.C. 770 (1971).  Accordingly, we must evaluate whether the Valentes, acting together as petitioner's operative officers, earned the amount of compensation paid by petitioner.  Neither party introduced evidence about compensation paid by similar companies for similar services.

C.  The Character and Condition of the Company

Respondent characterizes petitioner as a small business with activities that are not complex.  As noted, petitioner's income during the years in issue was from passive sources (rents, interest, and dividends), and respondent emphasizes that those sources did not require much effort by the Valentes.  Respondent,

however, acknowledges that the increases to petitioner's 1995 and 1996 income were attributable to gain on the sale of real property and stocks. Those increases, compared to the average of the prior 3 years, amounted to $25,922 and $171,719 for 1995 and 1996, respectively.[4] Considered as a percentage increase over the 3 years prior to 1995, the increases were 4 percent and 27 percent, respectively.

Petitioner contends that its assets were "interwoven with the retail automobile business" and that it was Mr. Valente's knowledge, expertise, and involvement that made petitioner financially successful. Petitioner acknowledges that the Valentes did not devote their full time to petitioner but argues that petitioner's success was nevertheless dependent upon the Valentes.

D. The Conflict of Interest Between the Company and the Employee

The question posed here is whether the Valentes used their control of petitioner to pay deductible salary, as opposed to nondeductible dividends. As contended by respondent, substantially all of petitioner's income was paid out in the form of compensation to the Valentes. In that regard, respondent references Elliotts, Inc. v. Commissioner, 716 F.2d at 1243, for the proposition that there is a

---

[4] For computation of these increases see infra note 6.

> general problem [in] * * * distinguishing between dividends and compensation for services received by a shareholder-employee of a closely held corporation. What makes this situation troublesome is that the shareholder-employee and the corporation are not dealing with each other at arm's length. It is likely to be in the interests of both the corporation and the shareholder-employee to characterize any payments to the shareholder-employee as compensation rather than dividends. For this reason, a taxpayer's characterization of such payments may warrant close scrutiny to ensure that a portion of the purported compensation payments is not a disguised dividend. See Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 361 (9th Cir. 1974).

In that regard, respondent points out that petitioner paid out 26.7 percent and 57.1 percent of its gross income as compensation for 1995 and 1996, respectively. In addition, petitioner paid out in compensation to the Valentes' 81.6 percent and 88.7 percent of its taxable income before considering the compensation deduction for 1995 and 1996, respectively.

### E. The Internal Consistency in the Company's Treatment of Payments to Employees

Under this test, a company's formal compensation program is considered, and a comparative analysis is made of compensation to shareholder/employees in relation to compensation of nonshareholder employees. Petitioner had no such formal program; instead, Mr. Valente would decide the amount of compensation on a year-by-year basis. Moreover, the only other employee of petitioner was a bookkeeper who did not have comparable qualifications, responsibilities, etc.

F.  Independent Investor

In addition to and in conjunction with the above-considered traditional tests, the Court of Appeals for the Ninth Circuit has also used an independent investor test.  In Elliotts, Inc. v. Commissioner, supra at 1245, that test was described as follows:

> A relevant inquiry is whether an inactive, independent investor would be willing to compensate the employee as he was compensated.  The nature and quality of the services should be considered, as well as the effect of those services on the return the investor is seeing on his investment.  The corporation's rate of return on equity would be relevant to the independent investor in assessing the reasonableness of compensation in a small corporation where excessive compensation would noticeably decrease the rate of return.

The Court of Appeals for the Ninth Circuit has employed the independent investor test in conjunction with the other above-discussed tests as another means of measuring the reasonableness of officer compensation.

Petitioner contends that we should disregard the traditional tests and focus solely upon the independent investor test, in the same manner as the Court of Appeals for the Seventh Circuit did in Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999).  Petitioner contends that the traditional tests do not fit petitioner's situation, and use of the traditional tests "invites arbitrary decisions".  Before we decide whether it would be appropriate to focus solely on the independent investor test, we will first consider it in light of facts of this case.

Respondent, based on petitioner's tax returns, contends that, after subtracting the compensation deducted by petitioner, the return on petitioner's equity is as follows:

| Year | Pretax income | After-tax income | Equity[1] | Return on equity(%) |
|------|------|------|------|------|
| 1995[2] | $17,825 | $15,151 | $2,013,692 | .75 |
| 1996 | 58,755 | 49,066 | 2,028,715 | 2.42 |

[1] The amount of equity reflected consists of the total of the yearend balances in the capital stock, paid-in surplus, and retained earning accounts.

[2] The $17,825 amount is after a deduction for a net operating loss carryforward from another year.  Without considering the net operating loss deduction, the return on equity would be 1.67 percent for 1995.

Petitioner does not dispute the returns on equity computed by respondent based upon the information reported in petitioner's income tax returns.  Petitioner contends that we should focus on the return on equity in the form of appreciation of petitioner's assets.  Based on petitioner's calculation of the increases (appreciation) in the value of realty and securities, its return on equity for 1995 and 1996 would have been 34.5 percent and 36.5 percent, respectively.  Petitioner, on the same basis, contends that it had a 29-percent average return on equity for the years 1993 through 1996.

Respondent argues that petitioner's approach to measuring the return on equity is speculative and overstated and does not match the amount shown on petitioner's tax returns.  In other words, respondent contends that the return on equity should be

measured based on realized income and not on unrealized appreciation of the business assets.  Respondent points out that petitioner's percentage return is due to unrealized appreciation on marketable securities and estimated average appreciation on the leased Green Valley Ford property.  In addition, respondent notes that petitioner did not factually establish that the real property had appreciated to the extent claimed.  Significantly, there has been no showing that any portion of the claimed asset appreciation was due to the Valentes' efforts rather than general market conditions.

We cannot accept the inherent premise of petitioner's approach; i.e., that an independent investor would be satisfied with little or no return on petitioner's current income stream that was being generated with little effort on the part of petitioner's officers.  Petitioner's approach also assumes that an independent investor would forgo an established stream of income cash-flow return on equity for the possibility that unrealized asset appreciation will be available in the future. To some extent, an independent investor might invest in an entity for the possibility of asset appreciation.  That investor, however, would not, without some compelling reason, forgo the income stream from those assets.  That is especially true where, as here, the Valentes' efforts were, in great part, directed at the maintenance, as opposed to the creation of the income stream.

In fact, there is no evidence that the income stream (rental income and mortgage installment payments) was in jeopardy. While it is clear that the Valentes played some role in producing the 1995 and 1996 income increases over prior years, the increases were limited to the acquisition and sale of realty and marketable securities.

During 1995 and 1996, petitioner's adjusted taxable income (pretax and without considering net operating loss deductions from other years) was $294,587 and $518,755, respectively. Assuming an independent investor would have been satisfied with a 20-percent return, then as much as $235,670 and $415,004, for 1995 and 1996, respectively, would have been available for compensation of petitioner's officers. However, reasonable compensation cannot be based solely on allowing an amount that represented what was left after computing what was thought to be a fair return for an investor. Under any measure of reasonable compensation, the amount must be for "personal services actually rendered". Sec. 162(a)(1); Elliotts, Inc. v. Commissioner, supra at 1245; Exacto Spring Corp. v. Commissioner, supra at 835.

The facts in these cases reflect that a majority of petitioner's income stream would have existed regardless of the Valentes' services or efforts during 1995 and 1996. The passive portion of petitioner's income was well established and would continue with a minimum amount of effort. We also note that Mr.

Valente had been well compensated in prior years, reflecting that he had already been compensated for petitioner's financial success prior to 1995. Significantly, the Valentes were physically less able to devote their time and efforts to petitioner's business during 1995 and 1996, yet petitioner seeks to justify substantial increases in the Valentes' compensation over the average of the prior 3 years. The increases over the $209,462 average for the 4 prior years was approximately $30,000 in 1995 and $250,000 for 1996. Although, as discussed infra, there appears to be some justification for compensation in excess of the amount determined by respondent, the amounts sought by petitioner are unreasonable and unjustified on this record. The profit from the acquisition and sale of realty and securities, on the other hand, was more directly attributable to the Valentes' efforts.

The compensation paid to the Valentes represented 81.6 percent and 88.7 percent, respectively, of petitioner's 1995 and 1996 adjusted[5] taxable income. That would leave an independent investor with less than 20 percent and 10 percent of petitioner's income for 1995 and 1996, respectively. An independent investor might or might not be willing to accept a division of "operating" profits that is not based on the extent to which the efforts,

---

[5] The income was adjusted so as not to include net operating loss deductions from other years, special deductions, and the deductions for officers' salaries.

talents, or services of the officers were necessary for the generation of the profit. Those are the same aspects that we have considered to decide the amount of compensation that is reasonable. Accordingly, petitioner must show here that the Valentes were compensated for services and that the compensation was reasonable; i.e., that the officers in these cases were responsible for 81.6 percent and 88.7 percent of the profit.

Petitioner has not shown that the Valentes' efforts in the collection of petitioner's established stream of income would warrant any amount in excess of the annual $76,800 in compensation that respondent determined was reasonable. Petitioner, however, has shown that the increases to its income for 1995 and 1996 due to the sale of assets during the 1995 and 1996 years were attributable to the Valentes' efforts. Those efforts produced additional income in the amounts of $25,922 and $171,719 for 1995 and 1996, respectively.[6] Unfortunately the parties did not provide the Court with appropriate expert testimony or some methodology by which to decide the quantum of compensation (bonus) to be attributed to the results obtained by

---

[6] The total income for 1992, 1993, and 1994 was $604,344, $633,688, and $640,602 for an average total income of $626,211 ($1,878,634 ÷ 3). The total income for 1995 and 1996 was $898,479 and $806,071 for increases of $272,268 and $179,860, respectively. The $272,268 for 1995, however, includes $246,346 of income from recapture of depreciation, so that the increase in earned income was actually $25,922 ($272,268 - $246,346). The 1996 income figure contained recapture of $8,141 so that the adjusted income was $171,719.

the Valentes' efforts. Starting with respondent's $76,800 determination as a base amount attributable to the Valentes' collection of petitioner's established income, we have approximated an additional amount of compensation attributable to the increase in income generated by the Valentes during 1995 and 1996. We conclude and hold that reasonable compensation for the Valentes' services for 1995 and 1996 is $89,750 and $162,650, respectively. We calculated those amounts by dividing the increased amount of income earned by the Valentes' efforts between the officer/employee and equity holder, which when added to respondent's $76,800 determination resulted in an annual reasonable compensation of $89,750 and $162,650 for 1995 and 1996, respectively.[7]

Petitioner argues that the independent investor test should be the sole method of deciding whether the officer compensation claimed by petitioner was reasonable. Respondent counters that the independent investor test should be only one of the factors considered, citing the Court of Appeals for the Ninth Circuit opinion in Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983). In addition, respondent contends that the facts of

---

[7] The amount of compensation in excess of the $76,800, the amount determined by respondent, was calculated by dividing in half the 1995 and 1996 increases in income over the average of the 3 prior years, $25,922 and $171,719 and arriving at bonuses of $12,950 and $85,850.

these cases are distinguishable from those in Exacto Spring Corp.
v. Commissioner 196 F.3d 333 (7th Cir. 1999).

Respondent points out that the compensated officer of Exacto
Spring Corp. (Exacto), a fine wire and spring manufacturer, was a
technical expert who was integrally involved in development of
the automated machinery that was one of the reasons for Exacto's
financial success.  In addition, the compensated officer in
Exacto was responsible for the solicitation of 60 percent to 70
percent of Exacto's sales.  By contrast, the Valentes' services
to petitioner were, with the exception of the purchase and sale
of assets during the years under consideration, essentially to
maintain and collect petitioner's established and passive sources
of revenue.  Considering the fact that venue for any appeal of
this case would be the Court of Appeals for the Ninth Circuit,
see Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d
985 (10th Cir. (1971), and the fact that petitioner failed to
meet the independent investor test, we do not find it appropriate
to rely solely on the independent investor test to reach our
findings and/or holding.

II.  Whether Petitioner Permitted Its 1995 Earnings To Accumulate
     Beyond the Reasonable Needs of the Business--Section 531

Section 531 imposes an additional 39.6-percent tax on
accumulated taxable income.  Under section 535, accumulated
taxable income is adjusted taxable income less a dividends paid
deduction and the accumulated earnings credit.  For corporations,

other than holding or investment companies, the credit is generally an amount equal to the part of earnings and profits that is retained for the reasonable needs of the business. See sec. 535(c)(1). The term "reasonable needs of the business" includes the reasonably anticipated needs of the business. Sec. 537(a)(1). The accumulated earnings tax is imposed on corporations "formed or availed of for the purpose of avoiding the income tax * * * by permitting earnings and profits to accumulate instead of being divided or distributed." Sec. 532(a).

The controversy here focuses on two questions: (1) Whether petitioner was a "mere holding or investment company" so as to not be entitled to accumulate income for reasonable needs beyond $250,000, and, if not, (2) whether petitioner accumulated income beyond its reasonable needs. Respondent argues that petitioner meets the definition of a holding company as set forth in the statute and the regulations. A corporation is a "holding company" if it has "practically no activities except holding property and collecting the income therefrom or investing therein". Sec. 1.533-1(c), Income Tax Regs. A corporation is also considered an investment company if, in addition to holding properties and collecting income, it actively trades stocks, securities, real estate, or other investments. See id.

Petitioner held real property and stocks and received income from rent, interest, and the sale of stocks and realty. Although some of the income was from rent, the leases were net leases, and petitioner was not involved in operating or managing the rental properties. Petitioner's situation here is not, in any distinguishable aspect, different from that in H.C. Cockrell Warehouse Corp. v. Commissioner, 71 T.C. 1036 (1979), where the taxpayer's income was derived from the rental of real property to operating companies.

Petitioner argues that its circumstances are more similar to those of the taxpayer in Dahlem Found., Inc. v. Commissioner, 54 T.C. 1566 (1970). In that case, the Court explained that the word "mere" was designed to draw a distinction between holding or investment corporations that are strictly passive and those that engage in some measure of business activity. See id. at 1576. In H.C. Cockrell Warehouse Corp. v. Commissioner, supra at 1046, we described the activities that were sufficient to avoid "mere holding company" status in Dahlem Found., Inc. v. Commissioner, supra, as follows:

> (1) Locating an undeveloped parcel of real estate for a shopping center; (2) negotiating and paying the purchase price of such undeveloped land; (3) securing leases for occupancy of the buildings to be situated in the shopping center; (4) arranging for a loan for construction of the shopping center; (5) various management functions with respect to the center; and (6) maintaining and repairing various portions of the center. The taxpayer also actively managed other properties.

We do not find petitioner's activities to approach those that this Court found sufficient to distinguish between a corporation that is primarily a "holding company" and one that is a "mere holding company" in Dahlem Found., Inc. v. Commissioner, supra.  Accordingly, we hold that petitioner is a "mere holding company" within the meaning of section 533(b) and prima facie had a purpose of avoiding the income tax on shareholders.  In addition, petitioner has not shown evidence of any purpose for its accumulation other than testimony about possible expansion and legal theories about possible needs.[8]  Accordingly,

---

[8] We note that the burden of proof is on petitioner and has not been shifted to respondent under sec. 534(c).  See also Rule 142(e).  Although it is unnecessary for us to consider whether petitioner had reasonable needs of its business in excess of $250,000, we must note that under traditional standards petitioner has not shown that its needs exceeded the $250,000 amount.  Petitioner's needs were based on the speculation that Mr. Valente's future inability to provide such consultation to the auto dealerships could result in defaults on obligations to petitioner and that there would be a need for capital.  The financial status of the automobile dealerships, however, is not available in this record, nor is there any indication that such event was a need, without even considering whether it was "reasonable".  Petitioner also anticipated the death of the Valentes and the possibility of stock redemption to pay estate taxes.  To this respondent aptly points out that there would likely be no estate tax burden when the first of the Valentes died.  Finally, although no formal plans had been made or action taken, Mr. Valente described a desire to develop a parcel of property which had been held by petitioner for an extended amount of time.  Although Mr. Valente testified about some of these

(continued...)

petitioner was availed of for the purpose of evading the income tax on shareholders and is limited to accumulating, without imposition of accumulated earnings tax, no more than $250,000.

III.   Whether Petitioner Is Liable for Accuracy-Related Penalties Under Section 6662(a) for 1995 and/or 1996

Section 6662(a) imposes an accuracy-related penalty if any portion of an underpayment is attributable to negligence or disregard of rules or regulations or any substantial understatement of tax.  A substantial understatement for a corporation is an understatement that exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. For 1995 and 1996, petitioner's understatement may exceed the 10-percent or $10,000 threshold.  The penalty will not apply to any portion of an underpayment for which there was reasonable cause for the position taken and the taxpayer acted in good faith.  See sec. 6664(c).

Respondent, focusing on the reasonable compensation question, contends that the Valentes did little or nothing to earn the $240,435 and $460,000 salaries they were paid.  Although we have concluded that the value of their services was less than

---

[8](...continued)
matters, no steps had been taken or evidence presented that corroborated these matters as established or reasonable needs.

the amounts paid, we have found that the Valentes did play a meaningful role in the success of petitioner.  That is in contrast to respondent's contention that the Valentes performed no services and/or did not play a meaningful role in the financial success of petitioner.

Petitioner contends that no penalty should apply here because of its full disclosure to and reliance upon a competent professional.  See sec. 1.6664-4, Income Tax Regs.  The adjustments we have considered in these cases are quite technical in nature (whether petitioner was a "mere holding company" within the meaning of section 533 and whether the Valentes' compensation was reasonable).  Although our holdings are generally unfavorable to petitioner, we are convinced that petitioner relied on its accountant and that reliance was reasonable.  See United States v. Boyle, 469 U.S. 241, 251 (1985).  Petitioner's accountant, who testified at trial, was competent, and he was fully informed of the factual predicate for deducting the compensation in dispute.  His testimony regarding the compensation reflected that he was well informed.  He relied, however, on factors that the Court ultimately found insufficient to carry the day.  Petitioner, vis-a-vis the Valentes, had no tax expertise, and it was reasonable to rely on a fully informed and competent professional in the

matters under consideration.  Accordingly, we hold that petitioner is not liable for penalties under section 6662.

To reflect the foregoing and the agreement of the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.